Roy Johnson, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

DAVIDSON, P. J. Appellant was convicted of assault with intent to murder Tom Edwards; his punishment being assessed at four years confinement in the penitentiary.

The state's case was one of assault to murder, while appellant's was that of self-defense. Edwards testified that he had known appellant several months prior to the difficulty, and had never had any trouble with him; that he had met appellant at his (appellant's) home on more than one occasion; that he knew that appellant was living with a girl named Lula Gibbs. On the morning of the trouble, Edwards was at his own home, chopping kindling with which to make a fire, when appellant made his appearance, and asked him if he (Edwards) thought he had done right in marrying Lula Gibbs, and asked if he could see Lula Gibbs. Edwards sent for her. Appellant then began shooting him, and shot him five times. Two other witnesses (Adams and Ingrando) testified they were standing on the corner of the street, about 40 feet from the scene of the shooting; that they heard a shot, and turned and saw defendant shooting inside of the room, and after one or two shots he went inside the room, and directly he and Edwards came out tussling. After they reached the outside, appellant dropped his gun and grabbed an axe, and Edwards tried to keep appellant from striking him with it. The parties were then separated.

Appellant's testimony is substantially as follows: That he had known Edwards two or three months; that they became acquainted at his (appellant's) home; that he was living there with the girl Lula Gibbs; and that she "was his woman." About a week before the assault, Lula Gibbs told appellant she was going to Galveston to spend a week, and went away. He did not hear from her, and did not know where she was. Prior to this time, Edwards had come to his house quite often, and had gotten the girl Lula a trunk; that when the parties met on the Santa Fé tracks Edwards asked appellant if he did not like it, and pulled a pocketknife on appellant. On the morning of the assault, appellant went to Ingrando's store, about 40 feet from the house of Edwards, to pay a bill. As he went towards the store, Edwards called to him to come there, and he had gone over to where Edwards was standing. Edwards asked him if he had seen Lula Gibbs. Appellant replied that he had not, and at that time a cousin of Edwards rode up, and asked appellant to hold his horse, which appellant did. Edwards and the other party went into the house, and appellant overheard them talking, and heard one of them say: "Now is your time; it's just as good a time now as ever." Then Edwards and the other party came out of the house, and the third party mounted his horse and rode away. Edwards said it seemed funny that appellant would come around there, and had not seen this girl, and that he would fix it so appellant would not come out there any more. Edwards then grabbed an axe and started towards appellant; appellant caught the axe, drew his pistol, and shot. This is the substance of the testimony.

The only contention urged by appellant is that the court should have charged the law of aggravated assault. We are of opinion that that issue is not raised by the testimony. If appellant went to the house for the purpose of doing what he did, and executed his purpose by shooting Edwards five times, it would be an assault with intent to murder. If he went there under the circumstances he detailed, having been called there by Edwards, and Edwards brought on the difficulty by trying to use an axe upon him, he would be justified in doing what he did. Appellant, under the testimony, seems to have been outraged in his feeling because Edwards had seduced the woman from her allegiance to him, and from this standpoint the state's theory is that the motive was suggested for the difficulty. Edwards had married the woman, and at the time of the difficulty she was his wife. We are of opinion that the court was not in error in failing to charge the issue of aggravated assault under the facts.

The judgment is affirmed.

<hr/>

### YNDO v. RIVAS et al.†

(Court of Civil Appeals of Texas. San Antonio. Dec. 13, 1911. On Motion for Rehearing, Jan. 17, 1912.)

1. PRINCIPAL AND SURETY (§ 185*)—SURETY'S RIGHT OF REIMBURSEMENT.

Where a surety pays a debt for his principal, the surety's claim for reimbursement is not on the original debt, but on an implied promise arising out of the relation of the parties.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 524–538; Dec. Dig. § 185.*]

2. LIMITATION OF ACTIONS (§ 28*)—SURETY'S RIGHT OF REIMBURSEMENT.

A surety's right of action for reimbursement is barred in two years.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 134, 135; Dec. Dig. § 28.*]

3. FRAUDS, STATUTE OF (§ 16*)—PRINCIPAL AND SURETY—PROMISE OF REIMBURSEMENT.

A principal's promise to reimburse his surety for paying the principal's debt is not within the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 22–26; Dec. Dig. § 16.*]

4. PRINCIPAL AND SURETY (§ 190*)—PAYMENT OF DEBT—CONTRACT OF REIMBURSEMENT—EVIDENCE.

Evidence held insufficient to show the making of an express promise by the principal to

reimburse his surety for payment of the principal's debt based on a new consideration or promise not to sue, so as to support the surety's action for reimbursement, his right to sue on the implied promise being barred by limitations.

[Ed. Note.—For other cases, see Principal and Surety, Dec. Dig. § 190.*]

5. LIMITATION OF ACTIONS (§ 49*)—PAYMENT OF DEBT — SUIT FOR REIMBURSEMENT — ACCRUAL.

Plaintiff having been surety for R. on several renewals of notes given to cover R.'s misappropriation of funds, the creditor refused longer to accept paper signed by R., but accepted plaintiff's individual note therefor, to which R. was not party, and R. agreed with plaintiff to reimburse him for payment of the debt. *Held*, that the execution of the surety's sole note for the amount of the debt constituted a payment thereof as between him and the principal, and that limitations against his right to recover reimbursement began to run from that date and not from the date of his payment of the note.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 266–272; Dec. Dig. § 49.*]

On Motion for Rehearing.

6. LIMITATION OF ACTIONS (§ 28*) — RIGHT OF SUBSEQUENT CREDITOR.

Where more than 10 years had elapsed after the execution of a deed from a debtor to his wife at the time plaintiff paid a debt owing by the grantor on which plaintiff was surety, plaintiff's right to set aside such conveyance and subject the property to the payment of his claim for reimbursement was barred.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 134, 135; Dec. Dig. § 28.*]

7. EVIDENCE (§ 271*)—DECLARATIONS OF DECEASED GRANTOR.

Declarations of a deceased grantor that he had conveyed property to his wife in trust for himself were self-serving and inadmissible alone to establish a trust.

[Ed.Note.—For other cases, see Evidence, Cent. Dig. §§ 1068–1079, 1081–1104; Dec. Dig. § 271.*]

8. TRUSTS (§ 87*) — CREATION — EVIDENCE — PAYMENT OF TAXES.

Where more than 10 years had elapsed since a husband's conveyance of land to his wife by an absolute deed, proof that taxes on the land were assessed and paid in his name, and that he asserted ownership, was inadmissible after his death to affect the wife's title and prove that she held the same in trust for him.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 87.*]

9. TRUSTS (§ 89*) — ESTABLISHMENT — EVIDENCE.

Where a husband conveyed land by an absolute deed to his wife, testimony of a single witness after the wife's death as to declarations by her, in which she admitted that she held the land as trustee for her husband, was insufficient to establish the trust.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 89.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by Manuel Yndo against Antonio Rivas and others. Judgment for defendants, and plaintiff appeals. Affirmed.

D. A. McAskill, for appellant. Bertrand & Arnold and R. S. Cozby, for appellees.

COBBS, J. This suit was instituted by Manuel Yndo against F. A. Chapa, personally and as independent executor of the estate of Antonio P. Rivas, deceased, and his wife, Adelaida Chapa, Edward M. Rivas, and Antonio G. Rivas. He prays judgment for the sum of $3,389.76 with interest paid on note to A. B. Frank for Rivas. Also to set aside deed dated April 16, 1888, by A. P. Rivas, deceased, to his deceased wife, Maria Q. Rivas, and subject the property conveyed therein, being lot No. 4, block No. ——, city block No. 150, Cor. Laredo and Houston streets in the city of San Antonio, Bexar county, to the payment of his debt on the alleged ground that it was the separate property of A. P. Rivas; the conveyance being made to his wife as his agent for his use and benefit, creating between them the relation of principal and agent. That subsequently she reconveyed the property, but the deed was never placed on record. It was alleged that Mrs. Adelaida Chapa (wife of F. A. Chapa), Edward M. Rivas and Antonio G. Rivas are the surviving children and heirs and devisees of Antonio P. Rivas, who died February 1, 1907, leaving a will, duly probated March 14, 1907, appointing F. A. Chapa independent executor without bond, devising one-half to Mrs. Chapa, one-fourth to Edward M. Rivas, and one-fourth to Antonio G. Rivas. Further, alleged Maria Q. Rivas, deceased, was the wife of Antonio P. Rivas, deceased, that she died intestate in the year 1897, and that A. P. Rivas qualified as administrator of said estate June 8, 1897, of his said mother-in-law, Maria Q. Rivas. He alleges that at the date of the death of his said wife Rivas abandoned the property as his homestead, which was prior to the creation of the debt sued upon. At the time of her death, his family consisted of himself and his said wife, that he immediately abandoned said homestead and never thereafter resided upon the same. He alleges that the debt sued on was the debt of Antonio P. Rivas, and he was merely surety thereon, though the obligation was in his name and not in the name of Rivas, and plaintiff got no benefit therefrom, though plaintiff paid same. He alleges as a reason why said debt was permitted to run unsettled so long was because Rivas always promised to pay him, and reimburse him when he sold the property herein described which was done before his death. The answer claimed the property as the homestead of Antonio P. Rivas and his wife, Maria Q. Rivas, on the 16th day of April, 1888, and for years prior thereto and continued as the homestead of himself and family, which consisted of Antonio P. Rivas and his minor children until his death on February 1, 1907, and was the homestead of himself and minor son, Antonio G. Rivas, and said property was for that reason not subject to his debts. He also alleges the

property was the separate estate of Maria Q. Rivas, and descended to her children freed from said debt, and used by her as her homestead long prior to said debt, and the said debt is barred by the statutes of two and four years.

Defendants deny their liability, and say the debt was extinguished as against Rivas because the obligation of Yndo to Frank was by a note executed alone by him which retired and released all the former notes of Rivas, and that said debt became as between Rivas and Yndo barred by the statute of limitation of four years prior to the institution of this suit, and cannot be enforced aganst defendants or their said property. The court instructed a verdict for the defendant. There was sufficient evidence to show that the debt sued upon was for money plaintiff and his father paid on notes due A. B. Frank for Antonio P. Rivas; that there were several renewals of notes due to said A. B. Frank by Rivas and the last note renewed was dated February 18, 1904, and signed alone by Manuel Yndo, because Frank did not want Rivas on the note, which merged all previous obligations, including notes for interest paid for said Rivas in one note.

We shall not set out the assignments of error and discuss them, as the court gave a peremptory instruction to the jury to return a verdict for defendants, but will examine the entire record to see if there be any reversible error in the action of the court, which is laborious especially because the statement of facts is not indexed.

The first question we shall discuss is whether or not said debt is barred by the statute of limitations. We present all the evidence introduced by plaintiff to avoid the plea of limitations. The first witness was Mr. Seelig Deutschman, an attorney, who stated: "Mr. Rivas told Mr. Yndo, 'I will never owe you a dollar as long as I have got a dollar, and if I' die, after I am dead, my children will pay it, if I don't have time before, and this is an honor debt. I was administrator for these children, and I used this money, and I want to get you to do me the favor to let me pay the Flores judgment out of this, and I will pay you.' He says, 'If you will let me pay, if you will allow me to pay with this money the Flores judgment, I will promise you that when I sell that corner out of the proceeds of that sale the money shall be paid to A. B. Frank, every dollar, or to you, or to you if you pay it for me. * * *' The next matter we had up with Mr. Rivas was in connection with the beginning of the widening of Houston street. * * * Mr. Rivas said if the street was widened the property would come into the market and bring a good price, and he said 'When the street is widened and the property sold, I intend to pay the debt to A. B. Frank and interest Mr. Yndo paid for him * * * 18 months, I guess, before he

died, or maybe a little less. Why, I wrote him a note one day to come to see me and try to arrange our matters in some shape * * * he said he had gotten my letter, that he didn't think he cared to put the property in any shape where its record would be incumbered in any way, but that he was going to draw a will—a paper—and in that paper provide what he intended to do, and intimated he wanted me to draw the paper, but gave me no positive instructions except he told me the way he wanted the paper drawn * * * and that in that will he would provide that the Yndo matter be settled, the Yndo-Frank matter be settled. * * * The people were close friends. * * * The old fellow a short time afterwards became paralyzed." He was the attorney for Rivas and filed the will for probate. The will did not provide for the payment of the debt. And F. A. Chapa qualified as the executor under said will on the 30th day of March, 1907.

Again, Mr. Deutschman said: "Mr. Yndo asked Mr. Rivas to take care of at least a part of the Frank debt, and Mr. Rivas told him he could not possibly do it out of this money. A judgment had been obtained against him and was a debt of honor. Means used by him belonging to some minors and he must pay it, 'and want you to know I am not going to beat you folks out of one single debt or one dollar's interest you pay out for me, and I will pay the Frank debt if you pay it. I will see you get the money back.' And he said: 'That corner is mine, and whenever that corner property is sold I am going to pay you that money.' I didn't file suit because the relations between Yndo and Rivas were closer than brothers born and raised together, and Yndo worshipped the ground Rivas walked on, and would have laid down—given him the last dime."

Mr. F. M. Giraud, city engineer of San Antonio, stated: "The Yndos and Rivas were great friends during their lifetime. The last time I saw Antonio P. Rivas he was very old—could hardly walk. I had a talk with Antonio P. Rivas with reference to Mr. Yndo and Mr. A. B. Frank. He asked me about Mr. Yndo, if he was well; said he (Rivas) expected to die soon, and wanted to have a settlement with Mr. Yndo; that he owed him an amount and wanted to pay him before he died, and he had that house at the corner; he did not owe anybody and he had to pay him. He said if he died soon and didn't pay it, he was going to request the family to pay it."

Manuel Yndo, on cross-examination by appellee, said: "The reason I did not file suit before Rivas' death was that I was depending upon his promises and when he died he left no arrangements for this, for the settlement of the matter. That is when I brought this suit."

Mr. Deutschman being recalled, among

other things, stated: "If there was any conflict in what I stated yesterday and the statement I have just made hereinabove about the verbal agreement, then the last statement is the correct version. Rivas promised to pay Yndo every dollar paid for him, to pay it out of the sale of that house. He did not state then when the house was going to be sold, but then afterwards he said when the house would be sold it would be paid. He didn't state what particular time he was going to sell the property. He said that was the only thing he had left that was unincumbered, had nothing but it, but he would pay it out."

This is all the testimony introduced to establish the promise of Antonio P. Rivas to pay the debt and to avoid the statute of limitations pleaded to defeat the cause of action.

The evidence showed that the debt was Antonio P. Rivas' who had been on the note with his surety, Yndo, but in the final renewal of notes Frank would not allow him further to go on the note, and only Yndo signed it. It is contended by appellee that this act discharged Rivas from his obligation to pay Frank the note, and therefore discharged him altogether to pay Yndo, which we regard untenable as to his obligation to Yndo at that time.

[1] It is held the right of action of a surety who pays note is not upon note but upon implied promise for his reimbursement. Lacy v. O'Reily, 40 Tex. Civ. App. 285, 89 S. W. 640. His recovery is upon the implied promise arising out of the relation of the parties.

[2] But this right of action is barred in two years. Faires v. Cockrell, 88 Tex. 437, 31 S. W. 190, 639, 28 L. R. A. 528; Willis v. Chowning, 90 Tex. 622, 40 S. W. 395, 59 Am. St. Rep. 842. But appellant seeks to avoid the statute of limitations of two years by showing an express parol contract to pay the debt after the sale of certain property, and this, it is urged, would take it out of the bar.

[3] This transaction is not of the class affected by the statute of frauds. There it has application to a different state of facts, such as where a promise is made to pay the debt of another, then it is required to be in writing. Here the transaction is between the parties themselves, and the promise is made by the principal in the debt to reimburse and repay the surety for paying his debt.

[4] The difficulty is to find any express contract to pay, based upon any consideration or promise not to sue. Appellant cannot rely upon the implied promise, for that is barred. He must rely upon a new contract and new promise based upon some consideration.

We have sought in vain to find a new promise made by Antonio P. Rivas, requesting Yndo not to sue or based upon any new consideration offered and received to induce Yndo not to sue. In fact, there does not seem to be any intimation that Yndo ever threatened or intended to sue or collect the debt out of Rivas, hence no necessity arose for Rivas to make the promise. It seems, at most, a case of complete confidence and friendship between them with no contract for repayment, Rivas always admitting the debt and promising to pay. It is not found in the testimony of Deutschman, for when Yndo and Rivas were in his office the debt had not been paid, and his promise, if it was more than an admission that he owed the money, putting it in the strongest light, was a promise to do no more than the law required of him, for the law already imposed an implied obligation to pay the debt, and in either case the debt would be barred in two years after the right to sue, counted from date of the payment by surety's note. There is no element of estoppel shown in this case, such as was shown in Elijah Smith v. Blake Dupree, 140 S. W. 367, decided by this court October 11, 1911, to prevent a suit, or any new promise based upon any consideration whatever in this record, that prevented appellant from timely suing, or that took the case out of the bar.

[5] But appellant contends there is no limitation in this cause because the suit was instituted within two years after note was paid, and by agreement has brought up and had filed a verified copy of the original petition, which we shall now consider from the standpoint of that claim. The original petition was filed in this cause on the 1st day of June, 1908, against F. A. Chapa and his wife, Adelaida Chapa, Antonio Rivas and Edward Rivas, surviving heirs and devisees of Antonio P. Rivas. The indebtedness of $3,389.67, the amount Rivas owed Frank, as already shown, was made up of several obligations and interest, that was merged in the note for that amount, dated February 18, 1904, payable to A. B. Frank or order on or before five years after date, with 8 per cent. interest per annum, with 10 per cent. after maturity. The note was paid by appellant in August or September, 1907. Therefore, two years had not elapsed when suit was instituted, as shown by file mark on the original petition, though more than two years had elapsed before amended petition was filed.

The contention of appellees, as stated, is that Rivas was discharged by Frank when Yndo gave his individual note for his debt, equivalent to a payment, and he had the right at once to sue Rivas on his implied assumpsit, and the statute on that very day was put in motion and Yndo's cause of action was barred in two years from the date of the note which Frank accepted without Rivas being on it. Treating the note as a payment, the statute ran from said date 1904 instead of the date of payment, September, 1907, and the debt would clearly be

barred. In Charbonneau v. Bouvet, 98 Tex. 169, 82 S. W. 460, and Willis Bro. v. Chowning, 90 Tex. 622, 40 S. W. 395, 59 Am. St. Rep. 842, the rule is distinctly laid down that the statute runs from the date when the surety pays the debt. But no question arose there, as here, that a note had been signed alone by the surety, which the obligee took in satisfaction of the debt and would not allow the principal to sign. In other words, there was no note of the surety given alone that could be treated as a payment, which did not bind the principal thereon. The surety's right of action is not on the note, but on the implied promise to pay, or rather to repay; and when in such case the surety gives his note alone, and is accepted, the surety need not wait to pay the note, but may compel the principal, by suit if necessary, to pay it.

It is true the surety may never pay the note, and yet may compel his principal to pay him the entire note and at the same time compromise his own note and secure from the transaction the benefit of a speculation. Still he has satisfied the principal's debt by substituting his own separate obligation and the obligee has been fully satisfied, and it is with the surety thereafter as to the course he shall pursue for contribution.

In Boulware v. Robinson, 8 Tex. 329, 58 Am. Dec. 117, the court says: "This distinction between the giving by the plaintiff of a bill of exchange or negotiable note, which has been accepted by the creditor in satisfaction of the defendant's debt, and the giving of a bond or other security not negotiable, which has been in like manner accepted, seems to have been maintained by the English and American courts, and must be received as the settled law."

A very clear distinction is made where the obligations belongs to the class of bonds shown in Boulware v. Robinson and liability of surety on promissory notes upon which he is alone bound. This case has never been overruled or questioned by our court. The case cited by appellant of Darrow v. Summerhill, 24 Tex. Civ. App. 208, 58 S. W. 162, 163, and other kindred cases, instead of supporting a contrary doctrine, is in perfect harmony with this theory.

On the subject, that a surety, who is bound on his principal's note, substitutes his own obligation in lieu thereof, treated as a payment of the principal's obligation, much has been written on both sides in different states. Stone v. Hammell, 83 Cal. 547, 23 Pac. 704, 8 L. R. A. 425, 17 Am. St. Rep. 272.

When the principal is bound on the obligation, the obligee has his cause of action against both, and the obligation being joint and several to the obligee, not until the surety pays the debt is he in a position to require contribution. In case of suit against them on the note, the surety may have his judgment over against his principal. But when the surety signs the note and becomes bound, and allows his principal to be released, his right of action at once arises because the surety has satisfied the obligee by his own note, which has the effect of payment. Such we regard as the decisions of our courts and the settled law in this state. See, also, Maysville Tel. Co. v. First Nat. Bank, 142 Ky. 578, 134 S. W. 887. This could not operate as a hardship or unjustly to a surety, for as soon as he settles his principal's debt he has his right of action against him for contribution.

For the reasons given above it is not necessary to discuss any other phase of the case or assignment of error, and the judgment is affirmed.

### On Motion for Rehearing.

There is a very decided distinction in the questions presented and raised in the cases cited from this case. It requires an agreement, or something tantamount to one, from a creditor to release his debtor. Hence, the case of Johnson v. Amarillo, 88 Tex. 509, 31 S. W. 503, and the other cases cited by appellants are not in point on the question.

It is not denied that the note was in fact what was called a "renewal" note. No significance need be placed to that for it was Rivas' debt that was discharged, and Rivas was likewise discharged by Frank for he would not permit Rivas to go on the note with Yndo. Frank took Yndo's note in settlement discharge and acquittance of Rivas' obligation and Rivas was released and discharged, as Yndo thereby discharged the debt with his own note and obligation, just the same as though he had paid it in money. That such was the intention of the parties is made too plain by their acts and conduct at the time and by the subsequent dealings between Yndo and Rivas. Besides, it is insisted throughout this case by appellants he (Rivas) was getting an extension of time from Yndo, never from Frank, for with him Rivas had no further dealing—it was a closed incident. Appellant is now urging he (Rivas) was to pay Yndo (not Frank) when he sold the property, and hence the claim of the suspension of limitations.

In regard to Yndo's forbearance as now insisted, based upon a consideration, we are referred again to Deutschman's testimony that "Manuel Yndo and A. P. Rivas did make a verbal agreement about 1897, about the time this second note for $2,000 was given. A. P. Rivas told Manuel Yndo that 'if you will let me apply this money on some other indebtedness, I will pay you when my property is sold.' This was about 1896-8. Yndo was telling him he understood he was going to get some money or sell some property, or was going to give a mortgage on some, and he hoped he would take some of that and pay the Frank debt." In another place in the statement of facts he said: "I was

·representing one-half of the Flores estate ·and one-half of that went to my client and they were talking to themselves. Yndo asked Rivas to take care of at least a part of the Frank debt and Rivas told him he could not possibly do it out of this money. A judgment had been obtained against him, and it was a debt of honor, means used by him belonging to minors and he had it to pay, and he said, 'I want you to know that I am not going to beat you folks.'" We re-·quote so much from the testimony to fix ·date of the supposed agreement, in response to appellants' request, to show whom Deutschman was representing, as complaint is made that our opinion indicates he was the attorney for Rivas. No such inference ·ought to be drawn, as we stated he filed the ·will of Rivas to be probated.

There was no demand made by Yndo himself or through any attorney, or threat, that he would sue unless he was paid. This conversation is fixed at about 1896, 1897, or 1898, a time antedating the note given, which note was given February 18, 1904, and signed alone by Yndo. We see no reason to ·change our views.

It must not be overlooked that there is a ·statute of limitations in this state governing the period of time when suits are to be in-·stituted, and such exception as is sought to avoid must be based upon a clear and sufficient agreement and consideration.

Independent of these considerations, we do ·not believe appellant has shown any right to ·subject the property to his debt described in ·the petition referred to in our opinion, where-·in it is sought to set the deed aside from Maria Q. Rivas, deceased, which A. P. Rivas conveyed to her on 16th of April, 1888. Deutschman stated Rivas told him during his lifetime that the property belonged to him; was conveyed to her in trust. Jose Delgado likewise stated Mrs. Rivas stated, in effect, she held the property for her hus-'band. Both of these alleged statements were testified to after the death of both parties. We intend only to state the effect, or rather ·a brief conclusion from their statements, for none of the so-called corroborating circum-·stances, as they are of no significance with-·out the declarations.

[6] In the first place, Yndo was a subse-·quent creditor, and he would have no claim to subject that property, unless in fact the heirs got it as property of A. P. Rivas, and ·had he attempted to subject the property any ·time after such statements, still the right to set aside the deed was barred by the statute ·of limitations, for when he gave his note or paid the debt more than ten years had ·elapsed after the deed was made.

[7] In the second place, the declarations of the deceased grantor, as detailed, were not admissible in evidence alone to establish a trust, because they belong to the class of self-serving declarations prohibited. Mooring & Lyons v. McBride, 62 Tex. 310; Trinity Lumber Co. v. Pinckard, 4 Tex. Civ. App. 671, 23 S. W. 1015.

[8] Neither was it admissible to show payment of taxes in husband's name and claim of property by him and assertion of ownership by him to affect his wife's title. O'Neal v. Clymer, 61 S. W. 547.

[9] The declarations of Mrs. Rivas alleged to have been made to a single witness, certainly uncorroborated, is not only against the sound policy of the law, but against the decisions of our courts. Keller v. Keller, 141 S. W. 583.

The testimony of a single witness as to the declarations of a deceased person alleged to be trustee alone is not sufficient against the recitals in a deed purporting on its face to convey a legal title to submit as evidence. Grace v. Hanks, 57 Tex. 14. This case has been a number of times cited and distinguished from other cases on the subject, but the main doctrine is as shown above. It also holds it may be corroborated in such a way as to become admissible.

The first inquiry then is, if the testimony itself given of the alleged declarations of the deceased husband and wife is competent to establish a trust, was there sufficient evidence tending to substantiate the statements to require the court to submit the issue to the jury?

In other words, was the transaction itself, away back in 1898, when deed was made, intended then to be a trust, and not merely in respect to declarations indefinite as to the time when trust was created? Wagner v. Mary Isensee et al., 11 Tex. Civ. App. 491, 33 S. W. 155. The time the several conversations alleged were given and to the date of creation of trust is not fixed at all, with any degree of certainty.

It must not be forgotten that there is no evidence showing the intention of the parties at the time the deed was made that it was to be held in trust. That deed must surely speak in this case with much potency, yea, perhaps, far more than any oral testimony here produced to contradict its recitals, after the cycle of all these years. There was no evidence to go before the jury of sufficient probative force to establish when the deed was delivered and recorded and legal title placed in Mrs. Rivas that it was to be held in trust and not intended to be her property.

The motion for rehearing is overruled.